**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No.

NICOLE SCHMIDT,

        Plaintiff,

    v.

ONE CLAIM SOLUTION, LLC, an Arizona limited liability company; and
DANIEL DOUD, an individual,

        Defendants.

---

## COMPLAINT AND JURY DEMAND

---

Plaintiff Nicole Schmidt ("Plaintiff"), by and through her attorneys, HKM Employment Attorneys LLP, for her Complaint and Jury Demand against Defendants One Claim Solution, LLC ("OCS") and Daniel Doud ("Doud") (collectively, "Defendants" or the "Company"), states and alleges as follows:

### PRELIMINARY STATEMENT

1. This is an employment discrimination case arising from Defendants' retaliation, interference with, and failure to reinstate Plaintiff because of Plaintiff's request to take and/or exercise of her right to take protected leave under the Colorado Family and Medical Leave Insurance Act, C.R.S. § 8-13.3-501 *et seq.* ("FAMLI"), as well as Defendants' failure to accommodate Plaintiff and its termination of Plaintiff's employment based on Plaintiff's actual and/or perceived disability, and/or in retaliation for engaging in the protected activity of requesting

1

reasonable accommodation in violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-401 *et seq*. ("CADA").

2.      After Plaintiff worked for Defendants as a remote consultant for several months, the Company actively recruited Plaintiff to serve as its Human Resources (HR) Director, and she began full-time employment with OCS in August 2023. Throughout her tenure, Plaintiff worked remotely from Colorado and consistently met or exceeded Defendants' expectations while earning praise from OCS's Chief Executive Officer ("CEO"), Defendant Daniel Doud.

3.      However, in mid-December 2023, Plaintiff began experiencing a debilitating, unrelenting migraine. Despite excruciating symptoms—including overwhelming pain, nausea, dizziness, and vomiting—she continued to work and be available for her team, even while she was forced to lie on the floor during or after meetings to cope with the pain and dizziness. After exhausting all her accrued sick leave, Plaintiff pushed to continue working through her disabling health condition because she did not want to lose her job.

4.      Despite the fact that Plaintiff was working through debilitating pain, she continued to perform her responsibilities at a high level. In February 2024, Plaintiff received a performance evaluation from Doud describing her performance as "exceeds expectations," as well as a merit-based bonus and an increase to her base salary. Nothing in Plaintiff's performance evaluation indicated any concerns about her performance or her availability to OCS's employees as a result of working remotely.

5.      As the migraine persisted, Plaintiff began medical treatment under a neurologist's care, including a steroid regimen and several other treatments, all of which were unsuccessful in alleviating the migraine. After nearly 100 days of continuous pain and unsuccessful treatments,

2

Plaintiff, desperate for relief and seeing no other viable option, began considering the necessity of taking temporary medical leave.

6.      On March 18, 2024, after consulting with her doctors, Plaintiff made the difficult decision to apply for 12 weeks of FAMLI leave. When Plaintiff's application was approved by the FAMLI program administrator the following day, Plaintiff promptly informed Defendants and requested the reasonable accommodation of being permitted to take 12 weeks of protected leave under FAMLI.

7.      Just three days after Plaintiff's request for the reasonable accommodation of medical leave for a definite duration, on March 22, 2023, Defendants terminated Plaintiff's employment. Defendants claimed their decision to terminate Plaintiff was based on the Company's need for an in-person HR Director in Arizona, despite never having communicated such a requirement and despite its other leadership—including Doud—working remotely. Notably, Defendants never offered Plaintiff the opportunity to move to Arizona to transition to in-person work prior to terminating her employment.

8.      Plaintiff's termination letter also incorrectly asserted that Defendants were not obligated to reinstate Plaintiff following Plaintiff's protected medical leave in a transparent attempt to preemptively justify Defendants' retaliatory termination of Plaintiff's employment.

9.      In short, rather than supporting a dedicated, high-performing employee who remained committed to her job through months of disabling pain, Defendants instead fired Plaintiff for exercising her right to take protected medical leave and/or because of a disabling health condition she could not control and her request for reasonable accommodation of the same.

3

**PARTIES**

10.    Plaintiff is, and at all times relevant was, domiciled in Colorado.

11.    Defendant One Claim Solution, LLC is, and at all times relevant was, an Arizona limited liability company with a principal street address located at 335 East Germann Road, #340, Gilbert, AZ 85297.

12.    Upon information and belief, One Claim Solution, LLC is not a citizen of Colorado.

13.    Upon information and belief, Defendant Daniel Doud is, and at all times relevant was, an individual domiciled in South Carolina.

**JURISDICTION AND VENUE**

14.    Plaintiff incorporates by reference the above paragraphs as though set forth separately and fully herein.

15.    This Court has original jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity between Plaintiff and Defendants.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the employment practices and other conduct alleged to be unlawful occurred in this District.

**ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED**

17.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

18.    On September 23, 2024, Plaintiff filed her Charge of Discrimination Number E2500026720 with the Colorado Civil Rights Division ("CCRD") against Defendant One Claim Solution, LLC ("OCS") alleging disability discrimination, failure to accommodate, interference,

4

and retaliation. On the same date, Plaintiff filed Charge of Discrimination Number E2500026721x against Daniel Doud alleging he aided and abetted the unfair or discriminatory employment practices of OCS.

19.     Plaintiff was issued Notices of Right to Sue from the CCRD for the above-listed Charges of Discrimination on April 7, 2025, and Plaintiff has filed the present action within ninety (90) days of receipt of same.

20.     Plaintiff has met all administrative prerequisites prior to filing this action.

## FACTUAL ALLEGATIONS

21.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

22.     Before Plaintiff began working for Defendants as a full-time employee, she was a remote consultant for OCS from approximately May to August 2023.

23.     Defendants were so impressed by Plaintiff's consulting work that the Company actively recruited her, even increasing its starting offer to entice Plaintiff to leave her employer at the time to join OCS as a full-time employee.

24.     Plaintiff began working for Defendants as a full-time employee on or about August 21, 2023 as the Company's Human Resources ("HR") Director.

25.     After Plaintiff joined OCS as an employee, she continued to receive positive feedback about her performance from her supervisor, the Company's Chief Executive Officer ("CEO"), Defendant Daniel Doud ("Doud").

26.    It was not a condition of Plaintiff's full-time employment, or an essential job function of her position as HR Director, that she transition from remote to in-person work, nor that she travel frequently to OCS's office in Arizona.

27.    Plaintiff continued to work remotely from her home in Colorado after the Company classified her as an employee.

28.    After Plaintiff had already started her tenure of employment with OCS, Plaintiff and Doud discussed whether it was feasible for her to travel to Arizona with some regularity.

29.    Plaintiff willingly agreed to travel to Arizona approximately every other week, or approximately twice per month.

30.    As it turned out, however, Defendants ended up requesting that Plaintiff travel to Arizona even less frequently than twice per month during the remainder of her employment.

31.    As a result, Plaintiff did not travel to Arizona even twice per month during her tenure of employment.

32.    Plaintiff at all times met or exceeded Defendants' legitimate performance expectations.

33.    On or about December 18, 2023, Plaintiff experienced the onset of a migraine.

34.    Plaintiff had experienced migraines before, and although they were incredibly painful, the pain would dissipate after a day or two.

35.    The migraine Plaintiff began experiencing on December 18, 2023, however, was different, because it did not dissipate after a day or two.

36.    Rather, Plaintiff's migraine continued for days and days, which turned into weeks, and stretched into months, throughout which time Plaintiff was in nearly continuous pain.

6

37.     Although Plaintiff would sometimes get a couple hours' reprieve from the migraine, day in and day out, she woke up in excruciating pain that she was powerless to stop.

38.     A few days after the onset of Plaintiff's migraine, Plaintiff disclosed that she was experiencing an ongoing, debilitating migraine to Doud.

39.     Plaintiff used all of her accrued paid sick leave, hoping the migraine would subside with time.

40.     Unfortunately, even after Plaintiff had used all her accrued paid sick leave, the migraine continued.

41.     Plaintiff returned to work after using up her accrued sick leave, because she did not want to lose her job with OCS.

42.     Plaintiff continued to keep Doud informed of what was going on with her debilitating health condition, and she pushed through the pain to continue to perform her job.

43.     Beyond Doud, many other OCS employees also knew Plaintiff was struggling medically, because she exhibited symptoms that resulted from the migraine. For example, Plaintiff sometimes had to lie on the floor after meetings just to try to work through the unbelievable pain she was experiencing, and on several occasions, she threw up after work calls.

44.     Some days, Plaintiff woke up feeling better than others, but, without fail, the migraine always returned so predictably that it would be more accurate to say that it never ceased for months on end.

45.     Despite the daily suffering Plaintiff was experiencing, she continued not only to do her job, but to perform her responsibilities at a high level, even traveling to Arizona if needed.

7

46.     At Plaintiff's performance review in mid-February—which was completed before Plaintiff made a request to take the reasonable accommodation of continuous leave under FAMLI—Doud rated Plaintiff at a 4 out of 5 in performance, indicating she had "exceeded expectations."

47.     At the time of Plaintiff's mid-February performance review, Plaintiff was able to perform the essential functions of her job with reasonable accommodation.

48.     At the time of Plaintiff's mid-February performance review, Plaintiff was exceeding expectations in her role even though she had been asked to travel to Arizona less frequently than twice per month.

49.     Commensurate with her mid-February performance review, Plaintiff received a merit-based bonus and a 4% increase to her base salary.

50.     As the migraine continued with no end in sight, in or around mid-February 2024, Plaintiff was evaluated by a neurologist to attempt to diagnose the cause of the migraine.

51.     Plaintiff's doctor recommended placing her on steroids, which she began taking on or about February 19, 2024.

52.     As a result, a Certified Physician Assistant with Plaintiff's neurologist's office, Jonathan Welker, wrote Plaintiff a note excusing her from work from February 19 to February 23, 2024 in order for her to undergo medical treatment for the migraine.

53.     Plaintiff provided the note to Doud the same day, writing:

My current migraine episode hasn't let up, but has gotten even worse over the weekend. I have been ordered to get an MRI, start a 13-day steroid, and an injection to try to get the pain to stop. I am at a complete loss on why this is happening and can't function without dizzy/pain/nausea. I spoke to my neurologist and they said it could get better after day 8 of treatment and wrote me a note. It excuses me for the week, but if things improve I can get back to work. I plan to try to log in and

8

move meetings around tonight or tomorrow. I will reach out to TJ and Elisabeth too - they were texting me about work questions today and will likely continue to do so throughout the week if they need anything.

54.     A couple of days later, Plaintiff wrote to Doud again, telling him unfortunately there had still not been an improvement after starting the treatment.

55.     Despite Plaintiff's doctor's note excusing her from work, Plaintiff continued to be available to her employees to help as much as the migraine would allow.

56.     Plaintiff reached out to Welker on February 24, 2024, letting him know there had still not been any improvement in her migraine-related pain and requesting another note to excuse her from work for the following week.

57.     Welker provided Plaintiff another note excusing her from work from February 26 to March 1, 2024.

58.     Even after nearly three weeks had passed, the steroids did nothing to lessen Plaintiff's migraine.

59.     On or about March 8, 2024, Plaintiff reached out to Welker again to tell him she had not seen an improvement and was still experiencing excruciating pain and discomfort.

60.     Plaintiff asked what the plan would be moving forward if the current treatment continued to not work, stating, "I'm open to trying anything[,] as this is unbearable."

61.     Several days later, Welker prescribed Plaintiff with new medications, but nothing lessened Plaintiff's pain.

62.     Welker also provided Plaintiff with a referral to a headache specialist, who Plaintiff contacted.

9

63.    Plaintiff continued to try treatments her doctors recommended, but even after she had completed several different treatment options under the supervision of her doctors, her migraine persisted.

64.    On or about March 11, 2024, during one of their regular conversations, Doud asked Plaintiff how she was doing with her migraine.

65.    Plaintiff replied honestly that she was struggling and would let the Company know what she needed as soon as she knew what her provider recommended next.

66.    Finally, when the migraine had been ongoing for nearly 100 days with no end in sight, Plaintiff felt she had exhausted all other options and would need to request continuous, temporary medical leave from work.

67.    After taking a short time to consider her options and consult with her doctors about other available treatment options that might enable her to continue working, on or about the evening of March 18, 2024, Plaintiff made the difficult decision to apply to take 12 weeks of continuous leave from work through the Colorado FAMLI program.

68.    Although Plaintiff communicated with Doud throughout the workday, she was worried that if she told Doud she was exploring continuous leave benefits available to her, he would immediately terminate her employment due to his volatile manner. Plaintiff was therefore hesitant to tell Doud about her application for protected leave under FAMLI until she was sure she would be eligible for FAMLI leave benefits.

69.    Plaintiff's fear of retaliation turned out to be well-founded, given the Company terminated her just days after Plaintiff informed Doud she had been approved for FAMLI leave by the State of Colorado.

70.     The State of Colorado approved Plaintiff's request for FAMLI leave on March 19, 2024, the day after she applied.

71.     As soon as Plaintiff learned she had been approved by the FAMLI program administered by the State of Colorado, she provided Doud with her approval letter and notified Doud of her request to take 12 weeks of continuous leave as a reasonable accommodation associated with her disability.

72.     Doud replied a short time later, asking Plaintiff to connect over the phone.

73.     However, as Plaintiff was experiencing intense pain due to her migraine, she requested Doud send any questions or communication via email, which she could respond to as soon as her pain abated.

74.     Doud ignored Plaintiff's request to communicate by email because of her disabling health condition, instead emailing Plaintiff again the next day to ask her to connect over the phone.

75.     Consistent with Plaintiff's most recent communication to Doud, she remained in severe pain and temporarily unable to work or take a work-related call, despite Doud's insistence otherwise.

76.     Then, on March 22, 2024—just three days after Plaintiff made a protected request to use the reasonable accommodation of continuous FAMLI leave due to her disabling medical condition—OCS sent Plaintiff a termination letter informing her the Company was declining to reinstate her following the 12 weeks of protected FAMLI leave she had requested.

77.     In the letter, OCS also claimed its decision to terminate Plaintiff was because it had supposedly and suddenly decided it needed an in-person HR Director to work full time from the

Company's office in Arizona, stating, "Over the last several months, the need for local, on-the-spot leadership has become increasingly apparent, prompting us to go a different direction."

78.    Plaintiff's termination letter was the first time Plaintiff had ever heard of any supposed need for an HR Director to work in-person from Arizona.

79.    At no time prior to the Company's March 22, 2023 termination letter did the Company communicate a supposed belief that the remote nature of Plaintiff's work was negatively affecting her performance or her availability as a resource to OCS employees.

80.    Rather, Defendants' sudden conclusion that the Company needed an in-person HR Director was in stark contrast to the performance review Plaintiff had received barely one month prior, in which her performance was rated as "exceeds expectations" and no mention was made of any supposed need for the HR Director to work from the Company's Arizona office.

81.    Defendants only began planning to terminate and replace Plaintiff after she disclosed her disabling health condition.

82.    Defendants did not offer Plaintiff the opportunity to transition to in-person work by moving to Arizona prior to terminating Plaintiff's employment.

83.    Furthermore, at the time of Plaintiff's termination, almost all of the members of Defendants' leadership team lived outside of Arizona and worked remotely.

84.    Currently, almost all of the members of Defendants' leadership team still live outside of Arizona and work remotely.

85.    For example, upon information and belief, Doud lives in South Carolina and works remotely the vast majority of the time.

12

86.    Upon information and belief, OCS's co-owner, Jeremy Traasdahl, lives in Idaho and works remotely the vast majority of the time.

87.    Upon information and belief, OCS's Director of Customer Success, Alisha Yartzoff, lives in California and works remotely the vast majority of the time.

88.    Upon information and belief, OCS's Chief Technology Officer, Eric Terry, lives in Iowa and works remotely the vast majority of the time.

89.    Upon information and belief, OCS's Account Executive, Connor Trahan, lives in Tennessee and works remotely the vast majority of the time.

90.    Upon information and belief, OCS's Marketing Director, Steve Colberg—who was hired in March 2024—lives in Colorado and works remotely the vast majority of the time.

91.    In Plaintiff's termination letter, Defendants specifically addressed their obligation to reinstate Plaintiff following her protected FAMLI leave and incorrectly concluded that the Company was not obligated to reinstate her.

92.    Instead of supporting a high-performing employee who sacrificed her own health and comfort for nearly 100 days before finally being forced to consider a temporary medical leave, Defendants chose to terminate Plaintiff in retaliation for exercising her rights under FAMLI and making a protected request for reasonable accommodation of her disabling health condition.

93.    On or about May 16, 2024, Plaintiff was approved to participate in another new treatment option for her migraine.

94.    During the first week of June 2024—before Plaintiff's twelve (12) weeks of FAMLI leave would have ended had her employment not been terminated—the treatment worked

to alleviate Plaintiff's migraine, allowing her to be pain-free for the first time in approximately six (6) months.

95.     Plaintiff continues to engage in treatment as an ameliorative and/or preventative measure to manage her migraine condition while actively working.

**FIRST CLAIM FOR RELIEF**
**Failure to Reinstate in Violation of the Colorado Family and Medical Leave Insurance Act**
**("FAMLI"), C.R.S. § 8-13.3-501 *et seq.***
**(Against Defendants One Claim Solution, LLC and Daniel Doud)**

96.     Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

97.     At all times relevant to this Complaint, Plaintiff was an "employee" as defined by C.R.S. § 8-13.3-503(7).

98.     At all times relevant to this Complaint, Defendants One Claim Solutions, LLC and Daniel Doud were each Plaintiff's "employer" as defined by C.R.S. § 8-13.3-503(8)(a) and (b) (defining "[e]mployer" to include "[a] person who acts, directly or indirectly, in the interest of an employer with regard to any of the employees of the employer[.]").

99.     FAMLI provides a covered individual with the right to take up to 12 weeks of paid family and medical leave if the individual "[h]as a serious health condition." C.R.S. §§ 8-13.3-504, 505(1).

100.    When Plaintiff's need for leave arose, Plaintiff was a "covered individual" as defined by C.R.S § 8-13.3.503(3).

101.    Plaintiff's chronic migraine is a serious health condition under the relevant definition, because it is an illness, injury, impairment, and/or physical condition that "involves continuing treatment by a health-care provider." *See* C.R.S. § 8-13.3-503(19).

14

102.    Plaintiff was therefore an eligible employee entitled to the protections of FAMLI at the time her need to take leave arose.

103.    A covered individual who has been employed with the covered individual's current employer for at least 180 days prior to the commencement of paid family and medical leave "shall be entitled, upon return from that leave, to be restored by the employer to the position held by the covered individual when the leave commenced, or to be restored to an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment." C.R.S. § 8-13.3-509(1).

104.    If an employee's need for leave is "foreseeable," employees are required to provide 30 days' notice to the employer of their intent to take FAMLI leave in order to retain the right to reinstatement following leave. C.R.S. § 8-13.3-505(5); 7 C.C.R. 1107-3:3.8.2.  However, where the need to take protected leave is not foreseeable, or providing 30 days' notice is not possible, the employee is asked to provide notice "as soon as practicable," either "the same day or the next business day." C.R.S. § 8-13.3-505(5); 7 C.C.R. 1107-3:3.8.3.

105.    During the 30 days preceding Plaintiff's request for continuous leave pursuant to FAMLI, Defendants knew Plaintiff was battling pain and other debilitating symptoms while she was undergoing a steroid treatment plan that rendered her temporarily unable to perform some job duties from time to time while she waited for the treatment to take effect and obviate the need for a continuous leave in excess of a one-week duration at a time.

106.    Plaintiff's need to take continuous leave pursuant to FAMLI was therefore not foreseeable prior to her application for FAMLI benefits.

107. Plaintiff provided Defendants with notice of her need to take continuous leave pursuant to FAMLI as soon as it was practicable for her to do so.

108. Plaintiff provided Defendants with notice of her need to take continuous leave pursuant to FAMLI the same day or the next business day after she learned of her need for leave.

109. If the employee can demonstrate that "the need for leave was not foreseeable and unusual circumstances justify the failure to comply" with the 30-day notice requirement for a foreseeable medical leave, the employee retains the right to be reinstated. 7 C.C.R. 1107-7:7.3(2).

110. Because Plaintiff's need for leave was not foreseeable prior to her application for benefits, and unusual circumstances justify her not providing notice sooner given she was undergoing at least one course of treatment intended to obviate the need for continuous leave pursuant to FAMLI, Plaintiff retained the right to be reinstated following her leave.

111. Plaintiff fulfilled her notice obligation by providing notice to Defendants of her need to take protected leave under FAMLI the next business day after she learned of the necessity of taking leave.

112. Defendants are prohibited from punishing or disciplining Plaintiff—including by terminating her employment and failing to restore her to the same or an equivalent position with equivalent employment benefits, pay and other terms and conditions of employment following her protected leave—due to any purported failure by Plaintiff to provide notice of her intent to take leave pursuant to FAMLI.

113. Defendants violated FAMLI by failing to reinstate Plaintiff to the same or an equivalent position following her protected leave, and by terminating Plaintiff.

16

114.    Plaintiff is entitled to damages equal to her lost wages, salary, employment benefits, and other compensation denied or lost, liquidated damages as provided under FAMLI, costs, attorneys' fees, interest, and equitable relief as deemed appropriate. *See* C.R.S. § 8-13.3-509(6)(b); 29 U.S.C. § 2617(a)(1).

## SECOND CLAIM FOR RELIEF
**Retaliation and Interference in Violation of the Colorado Family and Medical Leave
Insurance Act ("FAMLI"), C.R.S. § 8-13.3-501 *et seq.*
(Against Defendants One Claim Solution, LLC and Daniel Doud)**

115.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

116.    FAMLI makes it an unlawful employment practice for an employer to "interfere with, restrain, or deny the exercise of, or the attempt to exercise, any protected right" under FAMLI. C.R.S. § 8-13.3-509(3).

117.    Under FAMLI, employers are further prohibited from "tak[ing] retaliatory personnel action or otherwise discriminat[ing] against a person because the individual exercised rights under [FAMLI]," including "the right to request… [or] take paid family and medical leave from work." *Id.* at (4).

118.    Plaintiff engaged in protected activity under FAMLI by requesting, filing for, applying for, and/or taking paid family and medical leave from work due to a serious health condition. *See id.*; *see also* 7 C.C.R. § 1707-7:7.2.5.

119.    Just three days after Plaintiff notified Defendants of her need to take protected leave, Defendants terminated her employment.

120.    Defendants' conduct would discourage a reasonable employee from accessing family and medical leave insurance benefits. *See* 7 C.C.R. § 1107-7:7.2.6-7.

121.    Plaintiff is entitled to damages equal to her lost wages, salary, employment benefits, and other compensation denied or lost, liquidated damages as provided under FAMLI, costs, attorneys' fees, interest, and equitable relief as deemed appropriate. *See* C.R.S. § 8-13.3-509(6)(b); 29 U.S.C. § 2617(a)(1).

### THIRD CLAIM FOR RELIEF
**(Actual and/or Perceived Disability Discrimination and Failure to Accommodate in Violation of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. §§ 24-34-401 *et seq.*)**
**(Against Defendant One Claim Solution, LLC)**

122.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

123.    At all times relevant to this Complaint, Plaintiff was an "employee" of Defendant One Claim Solution, LLC as defined by C.R.S. § 24-34-401(2).

124.    At all times relevant to this Complaint, Defendant One Claim Solution, LLC was an "employer" as defined by C.R.S. § 24-34-401(3).

125.    The Colorado Anti-Discrimination Act ("CADA") prohibits employers from engaging in discriminatory or unfair employment practices against employees because of the employee's disability.

126.    At the time of Plaintiff's termination, Plaintiff was a disabled person within the meaning of CADA.

127.    Plaintiff suffers from a physical impairment which, in its active state and without the benefit of ameliorative devices, such as medication and/or medical treatment, substantially limits her ability to, *inter alia*, stand, walk, care for herself, and perform manual tasks as compared to the general population.

18

128.    Plaintiff's physical impairment also substantially limits the operation of her neurological and brain functions. *See* 29 C.F.R. § 1630.2(i)(1)(ii).

129.    Though Plaintiff suffered from a disabling medical condition at the time of her termination, Plaintiff was qualified for her job and capable of performing the essential functions of her position at the time of her termination or in the near future.

130.    At the time of Plaintiff's termination, Defendant also perceived Plaintiff as being substantially limited in her ability to work and perform other major life activities due to her disabling health condition, when Plaintiff was not so limited.

131.    Defendant discriminated against Plaintiff because of her actual and/or perceived disability by subjecting her to disparate terms, conditions, and privileges of employment, including terminating Plaintiff's employment, in violation of the CADA.

132.    Defendant further discriminated against Plaintiff because of her disabling medical condition by denying Plaintiff the reasonable accommodation of protected medical leave for a definite duration.

133.    Providing Plaintiff such reasonable accommodation would not have caused Defendant an undue hardship.

134.    Defendant further discriminated against Plaintiff by failing to engage in good faith in an interactive process reasonably calculated to ensure a reasonable accommodation could be developed that would allow Plaintiff's employment to continue prior to terminating her employment. Such reasonable accommodation—such as medical leave for a definite duration shorter than 12 weeks—would have permitted Plaintiff to perform the essential functions of her

position at the time of her termination or in the near future, and would not have imposed any undue hardship on Defendant.

135.   The effect of Defendant's discriminatory practices has been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of her actual and/or perceived disability, and/or Defendant's refusal to accommodate Plaintiff or engage in the interactive process in good faith.

136.   Defendant's above-described conduct was intentional.

137.   Defendant's above-described conduct was willful and wanton, and/or committed with reckless indifference to Plaintiff's protected rights.

138.   As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**FOURTH CLAIM FOR RELIEF**
**(Retaliation in Violation of the Colorado Anti-Discrimination Act, C.R.S. §§ 24-34-401, *et seq.* ("CADA"))**
**(Against Defendant One Claim Solution, LLC)**

139.   Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

140.   On or about March 18, 2024, and thereafter, Plaintiff engaged in protected activity, and Plaintiff was retaliated against as a result of that protected activity. Plaintiff engaged in protected activity under CADA when she requested the reasonable accommodation of being permitted to take up to 12 weeks of protected medical leave for a disabling medical condition.

141.    Just three days later, Defendant retaliated against Plaintiff because she engaged in in the above-described protected activity by terminating her employment.

142.    These are consequences that would tend to discourage similarly situated employees from requesting accommodations related to a protected medical condition and sharing information during the interactive process with an employer.

143.    Defendant's above-described conduct was intentional.

144.    Defendant's above-described conduct was willful and wanton, and/or committed with reckless indifference to Plaintiff's protected rights.

145.    As a direct and proximate result of Defendant's above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and he is entitled to such general and special damages, economic damages, punitive damages, and attorneys' fees and costs as permitted by law.

**FIFTH CLAIM FOR RELIEF**
**Aiding & Abetting Unlawful Employment Practices in Violation of the Colorado Anti-Discrimination Act ("CADA"), C.R.S. §§ 24-34-301 *et seq.*)**
**(Against Defendant Daniel Doud)**

146.    Plaintiff incorporates by reference the above paragraphs as though set forth fully and separately herein.

147.    One Claim Solution, Inc. engaged in acts defined by CADA to be discriminatory or unfair employment practices, including, but not limited to, failing to reasonably accommodate Plaintiff and/or discriminating and retaliating against Plaintiff by terminating her employment because of a disabling health condition and Plaintiff's request for accommodation of her actual and/or perceived disability.

148. Defendant Daniel Doud knowingly aided, abetted, incited, compelled, or coerced One Claim Solution, LLC to engage in those acts by, among other things, failing to reasonably accommodate Plaintiff, failing to engage in the interactive process in good faith, and terminating Plaintiff because of her disability and/or in retaliation for her protected activity.

149. Doud's above-described conduct was willful and wanton, and/or committed with reckless indifference to Plaintiff's protected rights.

150. Because Doud aided, abetted, incited, compelled, or coerced One Claim Solution, LLC to engage in acts defined by CADA to be discriminatory or unfair employment practices, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, inconvenience, and other non-pecuniary losses; and she is entitled to such general and special damages, economic damages, punitive damages and attorneys' fees and costs as permitted by law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendants and order the following relief as allowed by law:

A. Award Plaintiff's economic damages, as established at trial;

B. Award Plaintiff's compensatory damages including, but not limited to, those for past and future pecuniary and non-pecuniary losses, garden-variety emotional distress, pain, inconvenience, mental anguish, and loss of enjoyment of life;

C. Award Plaintiff liquidated damages pursuant to FAMLI;

D. Award Plaintiff punitive damages on all claims as permitted by law;

E. Award Plaintiff's attorneys' fees and costs incurred;

22

F.    Award Plaintiff pre-judgment and post-judgment interest at the highest lawful rate;

and

G.    Such further relief as the Court deems just and proper.

## JURY TRIAL DEMAND

Plaintiff requests a trial by jury on all issues so triable.

Respectfully submitted this 7th day of July, 2025.


**HKM EMPLOYMENT ATTORNEYS LLP**


By: *s/ Abby Zinman*

Shelby Woods #48606
Abby Zinman #57792
HKM Employment Attorneys LLP
518 17th Street, Suite 1100
Denver, Colorado 80202
720.410.8372
swoods@hkm.com
azinman@hkm.com
*Attorneys for Plaintiff Nicole Schmidt*

23